**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| ROBROY INDUSTRIES – TEXAS, LLC, a Texas corporation, and ROBROY INDUSTRIES, INC., a Pennsylvania corporation, | § § § § § | |
| *Plaintiffs,* | § § | Case No. 2:15-CV-512-WCB |
| v. | § § | |
| THOMAS & BETTS CORPORATION, a Tennessee corporation, | § § § | |
| *Defendant.* | § | |

| | | |
|---|---|---|
| THOMAS & BETTS CORPORATION, a Tennessee corporation, | § § | |
| *Plaintiff,* | § § § | |
| v. | § § | |
| ROBROY INDUSTRIES – TEXAS, LLC, a Texas corporation, and ROBROY INDUSTRIES, INC., a Pennsylvania corporation, | § § § § § | Case No. 2:16-CV-198-WCB |
| *Defendants.* | § § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

 Before the Court is <u>Thomas & Betts' Motion for Summary Judgment for Lack of Evidence Required by Plaintiff's False-Advertising, Product Defamation, and Unfair Competition Claims</u>, Dkt. No. 134 ("<u>Summary Judgment Motion</u>").  The motion is DENIED.

## BACKGROUND

Thomas & Betts Corporation ("T&B") and the plaintiffs ("Robroy") compete in the market for polyvinyl chloride ("PVC") coated electrical conduit, which is used to carry electrical wiring in buildings or other structures. The two companies are the major suppliers of PVC-coated electrical conduit in the United States. Robroy offers its conduit products under several brand names. T&B's conduit is known as "Ocal."

On several occasions, disputes have arisen between the competing companies (including the predecessor producer of Ocal). Robroy has complained that T&B and its predecessor have made false claims about Ocal and about Robroy's products. In 2015, the dispute came to a head when Robroy filed this action charging that T&B had engaged in false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), and had committed the Texas state law torts of unfair competition and trade defamation.

Robroy alleged that in advertising and in direct contacts with customers T&B had falsely claimed that only its Ocal products had certain features, and that Robroy's products lacked those features. In particular, T&B claimed that only its Ocal products met the UL 6 standard, which is the quality standard for PVC-coated electrical conduit established by a national standards-setting organization, Underwriters Laboratories, Inc. T&B also claimed that only its Ocal products satisfied the ANSI C80.1 standard, a standard established by the American National Standards Institute, and the NEMA RN-1 standard, a standard established by the National Electrical Manufacturers' Association. In addition, T&B claimed that "only Ocal" offers local installation training and certification. As to Robroy, T&B's promotional materials claimed that Robroy "abrade[s] the surface of the conduit prior to the application of the PVC," thereby "remov[ing] the protective coatings that the customer is paying for." T&B further claimed that Robroy used a

standard employed by ETL Semko Intertek, "because UL standards are not being followed by the abrading of the conduits [sic] exterior zinc finish." <u>Complaint</u>, Dkt. No. 1; Dkt. Nos. 1-1 through 1-4. Robroy contends that each of those statements was false.

T&B has now moved for summary judgment on both the federal and state law claims. As to the federal Lanham Act claim, T&B argues that Robroy has not offered sufficient evidence that the false statements allegedly made by T&B agents caused any cognizable injury to Robroy. As to the state law claims, T&B argues that those claims also fail because of lack of proof of causation; in addition, T&B argues that Robroy's unfair competition claim fails because Robroy is not a "consumer" within the meaning of the Texas Deceptive Trade Practices and Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.45.

## DISCUSSION

### I. The Lanham Act Claim

The Lanham Act provides, in pertinent part:

> Any person who [uses any] false or misleading description of fact, or false or misleading representation of fact, which . . . misrepresents the nature, characteristics, [or] qualities . . . of his or her or another person's goods . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

A plaintiff must establish five elements to make out a prima facie case of false advertising under the Lanham Act: (1) that the defendant made a false or misleading statement of fact about a product; (2) that the statement either deceived or had the capacity to deceive a substantial number of potential customers; (3) that the deception was material, in that it was likely to influence the consumers' purchasing decisions; (4) that the product was in interstate commerce; and (5) that the plaintiff has been or is likely to be injured as a result of the statement

at issue.  IQ Prods. Co. v. Pennzoil Prods. Co., 305 F.3d 368, 375 (5th Cir. 2002); Logan v.

Burgers Ozark Country Cured Hams Inc., 263 F.3d 447, 462 (5th Cir. 2001); Pizza Hut, Inc. v.

Papa John's Int'l, Inc., 227 F.3d 489, 495 (5th Cir. 2000).  To recover money damages under the

Lanham Act, a plaintiff seeking compensation for injury "must prove both actual damages and a

causal link between defendant's violation and those damages."  Rhone-Poulenc Rorer Pharms.,

Inc. v. Marion Merrell Dow, Inc., 93 F.3d 511, 515 (8th Cir. 1996); see also Versign, Inc. v.

XYZ.com LLC, 848 F.3d 292, 299 (4th Cir. 2017); L.S. Heath & Son, Inc. v. AT&T Info. Sys.,

Inc., 9 F.3d 561, 575 (7th Cir. 1993); ALPO Petfoods, Inc. v. Ralston Purina Co., 913 F.2d 958,

959 (D.C. Cir. 1990).  The causation element requires the plaintiff to prove causation under the

"proximate cause" standard.  Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct.

1377, 1390-91 (2014).

In seeking summary judgment on Robroy's claim under the Lanham Act, T&B focuses

exclusively on the element of causation.  T&B contends that the evidence Robroy has pointed to

during the summary judgment proceedings is insufficient to give rise to a genuine issue of

material fact on the issue of causation, and that summary judgment should therefore be entered in

T&B's favor.  The Court disagrees.  From the Court's review of the evidence in the summary

judgment record, there is sufficient evidence of causation to create a genuine issue of fact on that

element and thus to require that Robroy's Lanham Act claim be resolved by a jury.

T&B's position is that, even assuming its agents made false statements about its products

and Robroy's products, the evidence does not show that those statements proximately caused the

requisite injury to Robroy by causing customers to shift their purchases to T&B at Robroy's

expense.  T&B argues that Robroy's evidence showed no more than that it "simply faced the

speculative harm of increased competition for a customer project or potential sale—not that it

actually lost sales or incurred another such cognizable harm as a direct result of the statements-at-issue." Summary Judgment Motion, Dkt. No. 134, at 18. T&B further asserts that "there is no substantial evidence showing that Robroy lost a project or customer, or that Thomas & Betts ever gained one at Robroy's expense, because of these 'Only Ocal' statements." Id.[1]

T&B makes three points in support of its motion: (1) that Robroy has never been "kicked off" a specification for PVC-coated conduit for any reason related to the T&B statements at issue; (2) the evidence shows that customers made purchasing decisions based on price, quality, availability, and other factors having nothing to do with the alleged false statements; and (3) the evidence shows that customers made decisions to add T&B's Ocal product to the specifications for particular projects and to purchase Ocal based on price and other factors, not because of the allegedly false statements.

Robroy offers two responses: First, Robroy argues that it is entitled to a presumption of causation of competitive injury, because the statements at issue were literally false and either explicitly or implicitly compared T&B's products with Robroy's. Second, Robroy contends that even without the presumption of injury, the evidence is sufficient to support its assertion that T&B's false statements caused Robroy's injury, i.e., caused Robroy to lose contracts that it otherwise would have won.

### A. The Presumption of Causation

Robroy argues that in a case such as this one, involving a two-competitor market, T&B's false statements to potential customers about the competition were necessarily directed at

_____

[1] The term "only Ocal statements" is the shorthand the parties have used to refer to T&B's statements to customers characterizing Robroy's products unfavorably as compared to T&B's "Ocal" products, either explicitly or implicitly. For purposes of the summary judgment motion, the parties have treated the "only Ocal" statements as false; the motion focuses on whether the evidence is sufficient to show that those statements caused redressable injury to Robroy.

Robroy. As such, Robroy invokes a line of cases holding that deliberately false or deceptive comparative advertising gives rise to a rebuttable presumption that the causation element of the Lanham Act cause of action is satisfied.

A number of circuits have adopted the presumption of causation in such cases. See, e.g., Merck Eprova AG v. Gnosis S.p.A., 760 F.3d 247, 259-61 (2d Cir. 2014); Porous Media Corp. v. Pall Corp., 110 F.3d 1329, 1336 (8th Cir. 1997); Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1146 (9th Cir. 1997); Balance Dynamics Corp. v. Schmitt Indus., Inc., 204 F.3d 683, 694 (6th Cir. 2000); Pharmanetics, Inc. v. Aventis Pharms., Inc., 182 F. App'x 267, 273 (4th Cir. 2006); Hutchinson v. Pfeil, 211 F.3d 515, 522 (10th Cir. 2000). No circuit appears to have rejected that rule.

In addition, numerous district courts have reached the same conclusion, including district courts in the Fifth Circuit. See, e.g., Snac Lite, LLC v. Nuts 'N More, LLC, Case No. 2:14-cv-1695, 2016 WL 6778268, at *10 n.13 (N.D. Ala. Nov. 10, 2016); Greater Houston Transp. Co. v. Uber Techs., Inc., 155 F. Supp. 3d 670, 703 (S.D. Tex. 2015); W. Sugar Coop. v. Archer-Daniels-Midland Co., No. CV 11-3473, 2015 WL 12683192, at *3 (C.D. Cal. Aug. 21, 2015); Gen. Steel Domestic Sales, LLC v. Chumley, Civil Action No. 10-cv-1398, 2013 WL 1900562, at *15 (D. Colo. May 7, 2013); Campagnolo S.R.L. v. Full Speed Ahead, Inc., No. C08-1372, 2010 WL 455195, at *2 (W.D. Wash. Feb. 1, 2010); Trilink Saw Chain, LLC v. Blount, Inc., 583 F. Supp. 2d 1293, 1321 (N.D. Ga. 2008); HipSaver Co. v. J.T. Posey Co., 497 F. Supp. 2d 96, 108-09 (D. Mass. 2007); Healthpoint, Ltd. v. Status Pharms., Inc., 273 F. Supp. 2d 871, 885 (W.D. Tex. 2001); Ott v. Target Corp., 153 F. Supp. 2d 1055, 1072 (D. Minn. 2001). No district court decision that the Court could uncover rejects the presumption in the circumstances described in these cases.

Against this array of authority, T&B offers very little. It begins by asserting that the Fifth Circuit has not recognized a presumption of causation. While that is true, the Fifth Circuit has not rejected the presumption; it simply has not addressed the issue either way. T&B has pointed to no suggestion in any Fifth Circuit case that, if presented with an argument for recognizing the presumption of causation under circumstances in which the presumption has been recognized by the other circuits, the Fifth Circuit would strike out on its own and reject the presumption.

While T&B does not point to any Fifth Circuit case that rejects the presumption of causation, it hints at one point that the court's decision in Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379 (5th Cir. 1996), should be understood to have that effect. T&B, however, takes a circuitous route to that position. It cites HipSaver Co. v. J.T. Posey Co., supra, a district court case from Massachusetts that recognized the presumption; T&B then points out that the Massachusetts case cited the Fifth Circuit's decision in Seven-Up with a "but see" signal, which T&B regards as an "acknowledge[ment]" that Fifth Circuit law is to the contrary. In fact, however, the Seven-Up opinion says nothing about the presumption of causation, and the legal issue the HipSaver court was discussing when it cited Seven-Up was not the presumption of causation for intentionally false comparative advertising, but the quite different principle, adopted by some courts, that a court may award Lanham Act damages based on "the totality of the circumstances" even in the absence of proof of harm to the plaintiff. See HipSaver, 497 F. Supp. 2d at 107-08.

Other than the reference to the HipSaver court's citation to Seven-Up, T&B cites no Fifth Circuit authority that supports its position. Nonetheless, T&B asserts that for this Court to recognize the presumption of causation in a false comparative advertising case would "re-write Fifth Circuit precedent." Summary Judgment Motion, Dkt. No. 134, at 26. That is incorrect.

Simply put, the Fifth Circuit has been silent on the presumption issue; there is no Fifth Circuit precedent to "rewrite."

The Fifth Circuit decision that, in the Court's view, requires the closest attention is <u>Logan v. Burgers Ozark Country Cured Hams Inc.</u>, 263 F.3d 447 (5th Cir. 2001). In that case, Logan, a seller of meat products, brought a Lanham Act action against the Original HoneyBaked Ham Company of Georgia ("HoneyBaked"), charging that HoneyBaked had falsely advertised that its products were spiral sliced. The jury found that HoneyBaked had been guilty of false advertising and awarded Logan damages, even though it found that Logan had not established that it suffered any losses as a result of the acts of false advertising. The district court vacated the damages award, and the court of appeals affirmed. The appellate court held that there was sufficient evidence to satisfy the "injury" element of the Lanham Act. With respect to the separate requirement to show actual damages, however, the court held that Logan did not "prove damages with particularity sufficient to prompt the jury to find that he had established actual losses because of the false advertising." 263 F.3d at 463.

Logan argued that he was entitled to all of the profits on sales of products that HoneyBaked had made that were the result of HoneyBaked's false advertising. The court, however, rejected that argument and held that "where a plaintiff who has brought a Lanham Act claim for false advertising has failed to present evidence that the defendant benefitted from the alleged false advertising, the plaintiff will not be permitted to recover any of the defendant's profits . . . ." 263 F.3d at 465.

Although the court declined to apply a presumption of causation in the <u>Logan</u> case, that case was not one that would have called for the application of the presumption of causation even in those courts that have adopted the presumption. That is because <u>Logan</u> did not involve

comparative advertising of the sort that has been held to be necessary to invoke the presumption. There is no indication in Logan that the Fifth Circuit would not apply the presumption in a case involving intentionally false comparative advertising in a two-competitor market.  In fact, the case on which the Logan court relied for its causation analysis, Balance Dynamics Corp. v. Schmitt Indus., Inc., 204 F.3d 683, 694 (6th Cir. 2000), is a Sixth Circuit case that endorsed the presumption of causation as applied in cases involving intentionally false comparative advertising.

T&B next asserts that "courts for decades have interpreted the Lanham Act's false-advertising prohibition as requiring proof that the false advertising at issue caused damage and the injury that plaintiff claims," and that the Act indicates the need for proof of a causal link between the damages claimed and the defendant's false advertising.  Summary Judgment Motion, Dkt. No. 134, at 23.  While it is true that proof of causation is ordinarily required in Lanham Act cases, that does not speak to whether and under what circumstances that element can be satisfied by a presumption, as the cases cited above have held.  So T&B's assertion that causation must be proved does not answer Robroy's argument that the element of causation can be established in this case through the presumption of causation that has been held to apply in cases of intentionally false comparative advertising.

T&B contends that "it is ordinarily not the place of a lower court to impose on a reviewing court a new point of law contrary to that court's existing precedents."  Summary Judgment Motion, Dkt. No. 134, at 24.  While T&B counsels the Court against adopting a position contrary to the reviewing court's law, that is the not what is at issue in this instance, as the Fifth Circuit has not rejected the presumption of causation with regard to comparative false advertising.  This Court is required to decide whether the presumption applies or not.  The

circuits are uniform in their decisions on this issue, with six lining up with Robroy and none on T&B's side. The district court decisions, including decisions in neighboring districts within the Fifth Circuit, have also uniformly adopted the presumption in false comparative advertising cases. In light of the weight of the precedents, it is not Robroy that is asking the Court to take a bold step contrary to precedent; it is T&B.

As for T&B's assertion that courts have required proof of causation in Lanham Act cases for decades, that is true. What is also true, however, is that for decades courts have recognized that the original proof of causation in comparative false advertising cases can be established through a rebuttable presumption. T&B's argument that it is significant that Congress has not acted to adopt the presumption of causation in such cases actually cuts against T&B. Given that courts have uniformly recognized the presumption for the past 30 years, Congress's silence in the face of that now well-established line of authority suggests, if anything, that Congress is satisfied with the status quo.

Finally, T&B argues that even if the presumption of causation were applicable to willful, literally false comparative advertising, it would not be applicable in this case, because the PVC-coated conduit market is not a "two firm market," and because T&B's "Only Ocal" statements "do not explicitly reference or compare Robroy's PVC-conduit products." Summary Judgment Motion, Dkt. No. 134, at 27. Robroy, however, cites evidence that during the period at issue in this case, the PVC-coated electrical conduct market has been effectively a two-competitor market. See Dkt. Nos. 156-1, at TNB00014437; 156-2, at 187; 156-3, at 143-44, 160; 156-13, at TNB00068472. Moreover, Robroy cites evidence that some of the false statements at issue in this case were directed at Robroy by name. See, e.g., Dkt. Nos. 156-23, at ROB000028-29; 156-31, at TNB74223; 156-32; 156-33. Beyond that, much of the evidence regarding T&B's false

statements consisted of comparative advertising, which would be understood as referring to Robroy by clear implication in the two-competitor market. See, e.g., Dkt. Nos. 156-24, 156-30, 156-40, 156-42, 156-43, 156-44, 156-57, 156-58, 156-59, 156-60, 156-62. In that setting, as Robroy points out, if the plaintiff proves deliberately false or deceptive advertising, it can be sufficient to invoke the presumption, "even if it is not a classic instance of comparative advertising where one company's advertisement mentions a competitor's product by name." Merck Eprova AG v. Gnosis S.p.A., 760 F.3d at 260-61; see also Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 161-62 (2d Cir. 2007) (advertisement that necessarily diminishes the value of the competitor's product in the eyes of consumers, even when not referring to the competitor by name, justified invoking the presumption of causation because consumers in that market understood that the competitor was the only provider of that product in a particular area).[2] Accordingly, the Court holds that summary judgment must be denied because the evidence is sufficient to create a factual issue as to the applicability of the presumption of causation. And if the presumption of causation applies, the evidence as to the element of causation is plainly sufficient.

**B. Evidence of Actual Causation**

Aside from the applicability of the presumption of causation, Robroy points to evidence in the record that creates a triable issue of fact as to whether T&B's false statements led directly to sales to T&B that otherwise would have gone to Robroy. Robroy's theory of the case is that the evidence shows that (1) in order to bid on a project, a manufacturer was required to be included on the specification for the project; (2) there were numerous projects on which T&B

_____

[2] The court in the Merck Eprova case referred to the "presumption of injury" rather than the "presumption of causation," but in context it appears clear that the court's use of that term was meant to incorporate the element of causation.

was not initially on the specification; (3) those contracts would have gone to Robroy but for T&B's actions that resulted in T&B being added to the project specifications; (4) it was T&B's false statements that caused project managers and engineers to alter the specifications to include T&B as a qualified bidder on those projects; and (5) on those projects on which T&B won the contract, Robroy suffered injury from the loss of a contract it would have won but for T&B's false advertising.

T&B responds that its customers purchased T&B's products because of price, quality, and availability, and not because of T&B's false statements. In reply, Robroy argues that T&B is focusing on the wrong part of the process. Robroy explains that while it may be true that in particular instances customers chose T&B's products over Robroy's products for reasons other than T&B's false statements, that occurred <u>after</u> the stage of the process in which the project engineers were persuaded to alter the specifications for their projects to allow T&B to bid. That was the critical step in the process, according to Robroy, because if T&B had not been allowed to bid on the projects in contention, it could not have secured the contracts to supply PVC-coated conduit to those customers. In that event, the contracts would have gone to Robroy because, according to Robroy's evidence, on many of the projects the specifications initially called for Robroy products or required quality assurances that only Robroy could meet. The critical step, according to Robroy's theory of the case, was the decision of project engineers to "open" the specifications to allow T&B to bid on the projects. And that critical step, Robroy asserts, was the result of what Robroy calls T&B's "disparagement campaign" against Robroy's products and its false representations with respect to T&B's Ocal product.

As noted, for purposes of the summary judgment proceedings T&B does not dispute that it made false statements regarding Robroy's products and its own Ocal product. It also does not

dispute that those false statements had the desired effect of deceiving customers. What T&B says Robroy has failed to show is that the false statements actually caused Robroy's injury, i.e., that the false statements were responsible for T&B winning contracts that otherwise would have gone to Robroy. The Court has reviewed the evidence Robroy has proffered on that issue and is persuaded that it is sufficient to defeat summary judgment.

To begin with, the false statements were clearly designed to cause engineers on the projects in question to "break" the specifications and "open" them to T&B's Ocal product.[3] Some of those specifications had required the use of Robroy conduit, and some had required that the conduit satisfy the "ETL standard," a standard based on testing conducted by ETL Semko Intertek, an international testing, inspection, and certification company. Robroy offers evidence that its conduit products satisfied the applicable ETL standard and that T&B's products did not. Dkt. Nos. 156-4, at 193; 156-6, at 49-51; 156-9, at 39-41, 97-98; 156-12, at 31-32.

Robroy proffers evidence that T&B's representatives made false statements disparaging the ETL standard and making false claims that Robroy's PVC-coated conduit products did not comply with other industry standards. For example, Robroy cites a form letter sent on behalf of T&B to engineers on numerous projects made a number of allegedly false statements about Robroy's compliance with industry standards, including the UL6 standard, the ANSI C80.1 standard, and the NEMA RN-1 standard. The letter included the following:

> Our Competitor the Robroy Company freely admits that they abrade the surface
> of the conduit prior to the application of the PVC. Incredibly, they *remove* the

---

[3] There is some disagreement between the parties as to whether a requirement on a specification for a particular product, or a product that satisfied a particular industry standard, prohibited non-qualifying sellers from bidding or being awarded the contract unless the specification was changed. For present purposes, it is sufficient to say that Robroy has pointed to evidence that such specification requirements barred non-qualifying products from being awarded the contract. See, e.g., Dkt. No. 156-12, at 31-32. That is, after all, the reason that T&B's product specification specialists were so intent on "breaking" restrictive specifications.

> protective coatings that the customer is paying for. . . . [Robroy] had to use [the ETL standard] for the boiling test because UL standards are not being followed by the abrading of the conduits [sic] exterior zinc finish."

Dkt. No. 156-23, at ROB000028-29.  Robroy points to evidence that it does not "remove" the protective coatings on the PVC-coated conduit, but instead abrades the surface of the zinc coating to ensure better bonding of the outermost PVC coating.  Dkt. No. 156-3, at 112-13. Robroy's evidence also shows that Robroy's conduit satisfied the applicable UL standard and that when a T&B representative inquired about whether Robroy's products were certified under the UL standard, Underwriters Laboratories informed T&B that they were.  Dkt. No. 156-73, at TNB00048006-07.

In addition, Robroy proffers evidence that T&B made a number of statements about Ocal on its website, stating that "only Ocal" had various qualities.  Given that Robroy's evidence shows that the PVC-coated conduit market is essentially a two-competitor market, the evidence would support an inference that those statements constituted a direct comparison between T&B's product and Robroy's.  T&B's website and other advertising made the following representations, according to Robroy's evidence:

> Only Ocal Blue Conduit is U.L. Listed, with both the zinc coating and the PVC coating investigated and listed per UL6.

> Only T&B supplies Ocal PVC coated conduit with a full, undisturbed zinc coating under the PVC coating.  This fulfills the requirements of NEMA RN-1 regarding undisturbed zinc coating over the conduit.

> Only Ocal PVC coated conduit is listed for UV resistance per UL 6.

> Only Ocal offers custom colors.

> Only Ocal offers local installation training and certification.

Dkt. No. 156-3, at 69-70; Dkt. No. 156-24.

Robroy's evidence includes other statements made on behalf of T&B to project engineers and others involved with projects on which T&B sought to bid. Those statements included assertions that Ocal "is UL listed with both the HDG zinc coating and PVC coating investigated per UL 6—Rob Roy is not," that Ocal "is UL listed for UV resistance—Rob Roy is not," that "Ocal provides an undisturbed HDG zinc finish allowing for [satisfying the requirements of] NEMA RN-1," that "Ocal offers custom colors—Rob-Roy does not," that "Ocal offers custom colors—Rob Roy does not," and that "Ocal offers local certified installation training—Rob Roy does not." Dkt. No. 156-31, at 74223. In other promotional materials, T&B asserted, similarly, that "only Ocal" is "UL listed for both zinc and PVC"; only Ocal "meets NEMA RN-1 regarding undisturbed zinc coating"; only Ocal is "UL listed for UV resistance," only Ocal offers "local installation training and certification," and only Ocal offers "custom colors." Dkt. No. 156-30. Those statements were incorporated into a variety of T&B promotional materials and communications with project engineers, many of which consisted of direct comparisons between Ocal and Robroy's product, as Robroy's evidence makes clear. See Dkt. Nos. 156-33, 156-34, 156-35, 156-37, 156-40, 156-42, 156-43, 156-44, 156-47, 156-57, 156-58, 156-59, 156-60, 156-102, 156-103, 156-104.

Other evidence shows that T&B provided the same information as "talking points" and training materials for its representatives to use in their efforts to persuade project engineers to include Ocal in their projects' specifications. Dkt. Nos. 156-45, 156-46, 156-47, 156-48, 156-93. The evidence also showed that a form letter including several of these false statements was posted on an internal bulletin board that was available to the project specification specialists at T&B who were responsible for attempting to "break" specifications that specified only Robroy products or ETL-listed conduit. Dkt. No. 197-9, at 132-35.

Robroy proposes to prove that T&B's false statements caused it injury through evidence that the false statements enabled T&B's agents to "break" the specifications on a number of projects that had been designated for Robroy products or products that met the ETL standards. Robroy's evidence includes evidence that the specifications on a number of projects were changed after T&B representatives contacted the responsible engineers on those projects. Robroy has also adduced evidence of statements made by the T&B representatives to the effect that their promotional efforts had been successful. In particular, Robroy's evidence includes claims by T&B representatives that the form letter that T&B used with project engineers had gotten "several large project approvals," Dkt. No. 156-91, at TNB00029235, and that a letter touting T&B's "ETL vs. UL 6" had "helped convert over $300k Ocal over the past 1-1/2 years." Dkt. No. 156-94, at TNB 00119391; see also Dkt. No. 156-95 (regarding T&B's promotional slide presentation, "I directly confront some RobRoy issues on a final slide if I'm going up against a RR sole spec to have that discussion right there while I'm in. Been very successful with this so far."); Dkt. No. 156-96 (referring to the T&B form letter comparing Ocal with Robroy's product that "our [representative] in the northeast used to get HNTB to approve us vs. ETL"); Dkt. No. 156-97 (same: "Here's a letter we developed for the sales force to go against ETL and has been successful"); Dkt. No. 156-98 (same: "I attached a letter stating our position why we choose [strictly UL performance verification and not the ETL 'boil' test]. This letter has helped break many 'ETL only' specs.").

Robroy proffers detailed evidence regarding several specific projects; that evidence supports its claim that T&B's false statements caused Robroy injury. For example, Tom Russ, a senior T&B sales representative, used the T&B form letter, which contained several alleged falsehoods, in an effort to "open" the specification for a project on the Ben Franklin Bridge in

Philadelphia. After T&B managed to open the specification to enable it to bid, see Dkt. No. 197-4, at 97-98, and was ultimately awarded the contract on that project, one of T&B's representatives commented, "That job was specified [Robroy] but with the help of you and T[o]m Russ [a senior T&B sales representative who promoted the use of the "only Ocal" material during efforts to "break" specifications] we were able to open it up to Ocal." Dkt. No. 156-92, at TNB 00012462.

On a second project, Mr. Russ sent the engineer copies of T&B's marketing materials containing the "only Ocal" statements; he subsequently recontacted the engineer and re-sent those materials. Dkt. Nos. 156-102, 156-103. The following day, Ocal was approved as an acceptable manufacturer on the project. Dkt. No. 156-105. And in a third instance, the engineer in charge of the project informed T&B that he was removing the ETL test from the specification because "it was proprietary and not an industry standard." That assertion was false, according to Robroy's evidence, but it tracked the false representations that had been included in T&B's promotional materials. Dkt. Nos. 156-85 through 156-87.

Citing Pizza Hut, Inc. v. Papa John's Int'l, Inc., 227 F.3d 489 (5th Cir. 2000), T&B argues that Robroy "cannot rely on evidence from Thomas & Betts' executives or other employees about their 'subjective intent' to convey a particular message to consumers," because such evidence is insufficient to show that the consumers in fact relied on the message in making their purchases. Summary Judgment Motion, Dkt. No. 134, at 28. In the Pizza Hut case, the Fifth Circuit found the evidence of subjective intent to deceive on the part of the defendants' executives to be insufficient to show that the false advertising in question actually succeeded in persuading customers to purchase the defendant's products instead of the plaintiff's. See Pizza Hut, 227 F.3d at 489. In this case, however, Robroy has pointed not only to evidence of an intent

to deceive customers, but to evidence—including statements by T&B representatives—that the effort succeeded.

There is ample evidence that the statements at issue in this case were false. Moreover, the context in which the statements were made and the contemporaneous statements of T&B representatives provide strong evidence that the false statements were made in order to "break" the specifications on the target projects and ultimately to win contracts for T&B. But beyond that, and unlike in Pizza Hut, there is evidence that the false statements had the desired effect. To be sure, the evidence that the false statements caused contracts to be awarded to T&B is, for the most part, circumstantial. And in some cases, such as the Pizza Hut case, the circumstantial evidence can be too weak to support a judgment. In many cases, moreover, simple chronology is not enough to support a reasonable inference of causation. See Seven-Up, 86 F.3d at 1389 (in the context of that case, "an inference of causation based merely on the chronology of events [was] not a reasonable one for the jury to make"). What is required is that the inference be one that a reasonable finder of fact could permissibly draw under the circumstances. See id. at 1387 ("where the jury . . . is asked to infer causation based on circumstantial evidence, this Court 'must determine whether this is a *reasonable* inference to be drawn from the evidence presented.'") (quoting Brock v. Merrell Dow Pharms., Inc., 874 F.2d 307, 309 (5th Cir. 1989)).

This is not a case in which the proof is limited to showing no more than that the defendant's representatives intended to mislead potential customers or that false statements were made in the course of competitive bidding, after which one party lost the project. Here, according to Robroy's evidence, Robroy was initially designated as the sole prospective bidder on numerous projects, either because the specifications called for Robroy conduit or because the specifications called for conduit that met a quality standard only Robroy's conduit could meet.

According to Robroy's evidence, Robroy was thus essentially guaranteed to be awarded a contract on those projects, until T&B "broke" the specifications, obtained the right to bid, and ultimately was awarded the contract. Robroy's theory is that T&B made false statements about Robroy's product and Ocal, and that it is reasonable to infer that those false statements played a pivotal role in the customers' decisions to allow T&B to bid on the projects.

The inferences on which Robroy relies are at least sufficiently reasonable to give rise to a genuine issue of fact. The strongest aspect of the inference that Robroy asks the Court to draw is that Robroy was the sole qualified bidder on certain projects until T&B contacted the engineers on those projects and persuaded them to open the specifications to T&B. While it is possible that the engineers decided to open the specifications for reasons unrelated to the falsehoods that were part of T&B's promotional efforts, there is ample room for a finder of fact to infer that the promotional materials, which were heavily focused on attacking Robroy's products, were very important to the decision to open the specifications. That inference is strengthened by the evidence that T&B's own representatives expressed their view that the characterizations of Robroy were responsible for the engineers' decisions to open the specifications to bidding by T&B, and that one of the project engineers repeated one such alleged falsehood when changing the specification to allow T&B to bid. Under these circumstances, the Court concludes that a reasonable jury could find that T&B's misrepresentations caused the injuries suffered by Robroy.

### C. Robroy's Request for Injunctive Relief

The parties devote very little attention to Robroy's request for injunctive relief; instead, they focus almost entirely on Robroy's claim for damages and the elements necessary to entitle Robroy to an award of damages. The elements that a plaintiff must prove in order to be entitled to an injunction under the Lanham Act are somewhat different from those that the plaintiff must

prove to be entitled to damages. In order to be entitled to an injunction, a Lanham Act plaintiff need not prove actual injury, but only that consumers are likely to be misled and that the plaintiff is likely to be injured as a result. See Cashmere & Camel Hair Mfrs. Inst. V. Saks Fifth Ave., 284 F.3d 302, 311 (1st Cir. 2002) ("[W]hereas a showing that the defendant's activities are likely to cause confusion or to deceive customers is sufficient to warrant injunctive relief, a plaintiff seeking damages must show actual harm to its business."). Consequently, even if T&B were correct in its contention that Robroy has failed to introduce sufficient evidence to show that it has actually been injured by T&B's allegedly false statements, that would not entitle T&B to summary judgment with respect to Robroy's claim of entitlement to injunctive relief. See Johnson & Johnson v. Carter-Wallace, Inc., 631 F.2d 186, 190 (2d Cir. 1980) ("The correct standard is whether it is *likely* that [the defendant's] advertising has caused or will cause a loss of [the plaintiff's] sales, not whether [the plaintiff] has come forward with specific evidence that [the defendant's] ads actually resulted in some definite loss of sales."). The Court therefore treats T&B's motion for summary judgment as limited to Robroy's request for damages. In light of T&B's focus on the elements required for proof of damages, Robroy's claim for injunctive relief would remain in the case regardless of the disposition of T&B's motion for summary judgment as applied to Robroy's damages claim.

The Court therefore DENIES T&B's motion for summary judgment with respect to Robroy's Lanham Act claim.

## II. The State Law Claims

With respect to Robroy's claims of trade defamation (Count II of the complaint) and unfair competition (Count III of the complaint), T&B makes two arguments. First, T&B reprises its argument that Robroy has not shown a causal relationship between T&B's false statements

and the injuries to Robroy. However, the same evidence that suffices to meet the causation requirement of the Lanham Act satisfies the causal relationship requirement for the two state law torts. Second, with regard to the unfair competition claim, T&B argues that the claim fails as a matter of law because Robroy does not qualify as a "consumer" within the definition of that term as used in the Texas Deceptive Trade Practices and Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.45.

As to the second argument, Robroy is asserting a common law unfair competition claim, not a claim under the Deceptive Trade Practices Act. It is therefore immaterial that Robroy is not a "consumer" within the meaning of that Act and accordingly was not able to take advantage of the Act's provisions, including the statutory procedures and remedies, see Tex. Bus. & Com. Code Ann. §§ 17.41-17.63.

T&B cites no authority in support of its argument that an unfair competition claim under Texas law requires that the plaintiff qualify as a party who could bring an action under the Texas Deceptive Trade Practices Act. To the contrary, all that is required to establish the common law tort of unfair competition in Texas is proof that the defendant committed an illegal or tortious act that interfered with the plaintiff's ability to conduct its business. Taylor Pub. Co. v. Jostens, Inc., 216 F.3d 465, 486 (5th Cir. 2000); Rail Scale, Inc. v. Balanced Railscale Certification, LLC, Case No. 2:15-cv-2117, 2017 WL 319078, at *2 (E.D. Tex. Jan. 23, 2017); Godfrey v. Wells Fargo & Co., No. 5:16-cv-79, 2017 WL 872679, at *6 (E.D. Tex. Jan. 9, 2017); Mondis Tech., Ltd. v. LG Elecs., Inc., Civil Action Nos. 2:07-cv-565 & 2:08-cv-478, 2011 WL 13097464, at *1 (E.D. Tex. June 9, 2011); Kodiak Prods. Co. v. Deegear, No. 02-13-422, 2015 WL 3523195, at *8 (Tex. App. June 4, 2015); Avanti Sales Int'l, Inc. v. Pycosa Chems., Inc., No. 01-04-983, 2005 WL 2670740, at *6 (Tex. App. Oct. 20, 2005); U.S. Sporting Prods., Inc. v. Johnny Stewart

Game Calls, Inc., 865 S.W.2d 214, 217 (Tex. App. 1993); Schoellkopf v. Pledger, 778 S.W.2d 897, 904-05 (Tex. App. 1989). In this case, the evidence is sufficient to show that T&B has committed a tortious act, because "[a] violation of the Lanham Act automatically provides a cause of action for common law unfair competition." Wellpath Solutions, Inc. v. Wellpath Energy Servs., LLC, Civil Action No. 6:12-cv-286, 2013 WL 1314423, at *4 (E.D. Tex. Mar. 28, 2013) (citing Babbit Elecs., Inc. v. Dynascan Corp., 38 F.3d 1161, 1181 (11th Cir. 1994), and Marathon Mfg. Co. v. Enerlite Prods. Corp., 767 F.3d 214, 217 (5th Cir. 1985)). Thus, the same evidence that allows Robroy's Lanham Act claim to survive T&B's summary judgment challenge satisfies the requirement that the defendant be shown to have committed a tortious act. And, other than its assertion of lack of causation, T&B does not suggest that the evidence fails to show that T&B's conduct interfered with Robroy's ability to conduct its business.

T&B argues that Robroy's contention that its unfair completion claim is a common law claim under Texas law "is not a fair or reasonable reading of Robroy's pleading," and that Robroy's allegations in the complaint "tie its unfair-competition count" to the Texas Deceptive Trade Practices Act. Thomas & Betts' Reply in Support of its Motion for Summary Judgment for Lack of Evidence Required by Plaintiff's False-Advertising, Product Defamation, and Unfair Competition Claims, Dkt. No. 185, at 10. The Court disagrees. Robroy's complaint does not rely on the Texas statute as the basis for the alleged unfair competition cause of action; with respect to the Texas Deceptive Trade Practices Act, the complaint simply states that the alleged false statements "constitute false advertising under the Lanham Act, and common law trade disparagement under Texas law," and that the statements "also constitute false, misleading, or deceptive acts or practices in the conduct of trade or commerce, which are injurious to the public as set forth in Texas Business Code § 17.46(8)."

T&B has not pointed to any authority that holds that an act that is unlawful under the Texas Deceptive Trade Practices Act cannot also constitute an unlawful act for purposes of the Texas common law tort of unfair competition. The Court therefore concludes that T&B has not shown that Robroy is required to prove that it is a "consumer" in order to pursue its claim of unfair competition. Nor has T&B shown that the claims of unfair competition and business disparagement are otherwise deficient. The motion for summary judgment as to Robroy's state law claims is therefore DENIED.

IT IS SO ORDERED.

SIGNED this 10th day of April, 2017.


_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE